Inland American Retail Management LLC   :

v.                  :

Cinemaworld of Florida, Inc.      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Inland American Retail Management LLC   :

v.            :

Cinemaworld of Florida, Inc.       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** The resolution of this appeal hinges on the interpretation of a clause concerning the allocation of real estate taxes that appears in a written lease between Inland American Retail Management LLC (Inland) and Cinemaworld of Florida, Inc. (Cinemaworld). Relevant to this appeal, a trial justice of the Superior Court—ruling on cross-motions for summary judgment—declared as a matter of law that the formula allocating Cinemaworld's reasonable share of real estate taxes should be based on the square footage of its leased premises. Relying on that conclusion, the trial justice granted partial summary judgment in Cinemaworld's favor with respect to its motion seeking an accounting, and he denied Inland's request for costs. Inland appeals from that decision, arguing that the trial justice erred when he adopted a formula that was not supported by the language of the lease. Inland also argues that the trial justice erred in declining to award interest, late charges, expenses, and attorneys' fees, all of which, Inland argues, are mandated by the lease. This case came before this Court on May 7, 2013, pursuant to an order directing the parties to show cause why the issues raised in this

- 1 -

appeal should not summarily be decided. After considering the parties' written and oral submissions, and after reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we vacate the judgment of the Superior Court.

# I

## Facts and Travel

### A

### The Lease

Inland and Cinemaworld were successors-in-interest to a twenty-year ground lease, entered into on December 16, 2003, for the rental of what is now a movie theater in the Lincoln Mall Shopping Center (Lincoln Mall or Shopping Center).[1] Under the terms of the lease, Cinemaworld incurred certain liabilities and expenses. These included "Minimum Rent," which was specifically defined in the lease, and "Additional Rent," which was described in the lease as "[a]ll other sums as shall become due and payable by Tenant to Landlord under this Lease." Article 1, section 1.01(i); Article 3, sections 3.01(a), (b).

Under the umbrella of "Additional Rent"—and the matter which gives rise to the underlying dispute—was the requirement that Cinemaworld pay an amount equal to the real estate taxes "levied, assessed, or otherwise imposed" against the movie theater. The provisions

---

[1] On December 16, 2003, Inland's predecessor-in-interest, LB Lincoln Mall Holdings LLC (LB Lincoln Mall), entered into a lease with Cinemaworld's predecessor-in-interest, Cinema World, Inc., to rent approximately 60,000 gross square feet, which included the land, buildings, and improvements thereon, as defined in the lease, located at the Lincoln Mall Shopping Center. On December 10, 2004, Cinema World, Inc. assigned all of its right, title, and interest as a tenant under the lease to Cinemaworld. In May 2006, MB Lincoln Mall, LLC (MB Lincoln Mall) purchased the Lincoln Mall from LB Lincoln Mall, and Inland became its managing agent.

Prior to the closing between MB Lincoln Mall and LB Lincoln Mall, LB Lincoln Mall and Cinemaworld executed a release agreement and estoppel certificate, which are not at issue in this case.

of the lease concerning the apportionment of real estate taxes included Article 9, entitled "Taxes," and Article 25, entitled "Tenant's Property."

Under section 9.01(a), "Taxes" were defined as "all taxes * * * commonly and generally referred to as 'real estate taxes' * * * levied, assessed, or otherwise imposed upon, the Land or any part thereof, the Building(s) and Improvements * * *."[2]  The lease also provided that Cinemaworld was required to exercise "its best efforts to take the steps necessary to have the Premises [it leased] assessed as a separate tax parcel"—something that Cinemaworld did not do. Section 9.01(b).  According to Inland, some tenants at the Lincoln Mall had their premises assessed and levied as a separate tax parcel and, pursuant to the lease, paid real estate taxes directly to the Town of Lincoln.  The remainder of the Lincoln Mall, including the premises leased to Cinemaworld, was taxed to Inland as a single parcel, and, therefore, pursuant to the lease, Cinemaworld was required to make monthly payments to Inland of a "reasonably estimate[d]" real estate tax, which was equal to one-twelfth of Lincoln Mall's real estate taxes for their leased premises for the current calendar or fiscal year.  Section 9.02(b).  The lease further provided that at the end of each year—after Inland had received all of the tax and assessment bills that were attributable to the Lincoln Mall—"Landlord shall furnish Tenant a written statement of the actual amount of the Taxes for such year," and the tenant would either pay or be credited for the difference between the amount of actual taxes due for the year and the "reasonably estimate[d]" amount that was paid.  Section 9.02(b).

---

[2] "Premises" is defined in the lease as "[t]he Land, the Building and the Improvements (as hereinafter defined)."  Article 1, section 1.01(e).  "Land" is further defined as the area "shown cross-hatched on the Preliminary Site Plan attached hereto as Exhibit B and made a part hereof," section 1.01(c); "Building" is defined as "[t]he building to be constructed on the Land by Tenant, as described in [Article 6, s]ection 6.01," section 1.01(d); and "Improvements" is defined as "any improvements existing on the Land as of the date hereof, the improvements to be constructed thereon by Tenant pursuant to the terms of this Lease as part of Tenant's Work * * * and such other improvements as Tenant may from time to time construct * * *," Article 2, section 2.01(a).

Also relevant to this appeal is section 25.01, entitled "Taxes on Tenant's Property," which provided, in pertinent part, that "Tenant shall be responsible for * * * any and all taxes * * * with respect to * * * [t]he Premises." With regard to the manner of payment, this section provided that if a tenant's premises was not assessed as a separate tax parcel, "Tenant shall pay to Landlord Tenant's reasonable share [of those taxes] as reasonably determined by Landlord in consultation with Tenant." Id.

**B**

**The Underlying Dispute**

On July 7, 2008, counsel for Inland forwarded a notice of default to Cinemaworld, citing a failure to pay the full amount of real estate taxes and alleging that, under the terms of the lease, $117,114.42 was due for taxes. The formula Inland employed to allocate the tax bill to the individual tenants, including Cinemaworld, was "on a pro rata basis by dividing each tenant's gross leasable square footage (60,000 for Cinemaworld) by the total gross leasable square footage for the Shopping Center."

Cinemaworld notified Inland that it disagreed with Inland's allocation of the real estate taxes and requested a breakdown of the figures used in the calculation. However, according to Cinemaworld, Inland simply responded with a list of the square footage of all of the Lincoln Mall tenants and a copy of the bill that it had previously sent to Cinemaworld. Despite Cinemaworld's objection to Inland's demand for the payment of unpaid taxes, on July 15, 2008, Cinemaworld paid $67,000 toward the real estate taxes that Inland claimed were due and owing.

On August 1, 2008, notwithstanding Cinemaworld's payment, Inland filed a complaint for breach of the lease for Cinemaworld's alleged failure to make timely payments as required by the lease. Cinemaworld filed responsive pleadings and, following an avalanche of amended

pleadings and other motions, both sides filed cross-motions for summary judgment in November 2009. In support of its motion for summary judgment, Inland maintained that the language of the lease was unambiguous and that it clearly required that real estate taxes be allocated by the square footage of Cinemaworld's leased premises, including the taxes attributable to parking and common areas. Conversely, Cinemaworld argued that the proper assessment of real estate taxes should not include the taxes attributable to parking and common areas. On June 1, 2010, Inland filed a supplemental memorandum in support of its motion for summary judgment, in which Inland asserted—for the first time—that the allocation of real estate taxes should be based on the fair market value of the leased premises.

On January 7, 2011, the trial justice rendered a written decision on the cross-motions for summary judgment. The trial justice found that "neither party appear[ed] to dispute the basic formula by which to calculate Cinemaworld's 'reasonable share' of the Taxes," and, based on this, he concluded "that Cinemaworld's reasonable share should be computed by multiplying the tax bill by a fraction, the numerator of which is the square footage of the theater and denominator of which is the square footage of the Shopping Center."[3] He also found that each party should bear its own attorneys' fees, costs, and expenses.

On October 4, 2011, Inland filed a motion for reconsideration, which the trial justice denied. Inland timely appealed, arguing that the trial justice erred by adopting a formula for

---

[3] Specifically, the trial justice provided that he calculated Cinemaworld's share of the real estate taxes by:

> "(1) taking the entire tax bill for the Shopping Center; (2) excluding the taxes attributable to the parking and common areas; (3) and multiplying the remaining tax bill by a fraction, the numerator of which is the square footage of the Building, and the denominator of which is the current leasable square footage of the Shopping Center which is not separately assessed to other tenants."

The trial justice also appointed a special master to provide an accounting as to the amount of real estate taxes owed by Cinemaworld under the terms of the lease.

calculating taxes that was not supported by any language found in the lease and by denying its request for interest, late charges, expenses, and attorneys' fees.

## II

## Standard of Review

It is well established that this Court reviews a trial justice's decision to grant summary judgment de novo, "employing the same standards and rules used by the [trial] justice." Empire Fire and Marine Insurance Companies v. Citizens Insurance Co. of America/Hanover Insurance, 43 A.3d 56, 59 (R.I. 2012) (quoting Generation Realty, LLC v. Catanzaro, 21 A.3d 253, 258 (R.I. 2011)). We will affirm a lower court's grant of summary judgment "[i]f we conclude, after viewing the evidence in the light most favorable to the nonmoving party, that there is no genuine issue of material fact to be decided and that the moving party is entitled to judgment as a matter of law * * *." Id. (quoting Pereira v. Fitzgerald, 21 A.3d 369, 372 (R.I. 2011)); see also Rule 56(c) of the Superior Court Rules of Civil Procedure.

## III

## Analysis

## A

## Lease Interpretation

Initially, we note that we do not agree with the trial justice's conclusion that "neither party appears to dispute the basic formula by which to calculate Cinemaworld's 'reasonable share' of the Taxes." Although it is true that the parties insisted both below and on appeal that the lease agreement was unambiguous, both parties nonetheless strongly advocate for different interpretations of the provisions concerning the calculation of real estate taxes. Inland maintains that the full amount of real estate taxes that are due under the lease should be calculated by

multiplying the fair market value of Cinemaworld's leased premises by the applicable tax rate. Cinemaworld, however, argues that the trial justice appropriately construed the terms of the lease in allocating the real estate taxes based on the square footage of the leased premises.

In reviewing the lease, we apply the laws of contract interpretation. See Elena Carcieri Trust-1988 v. Enterprise Rent-A-Car Co. of Rhode Island, 871 A.2d 944, 947 (R.I. 2005) (applying contract-interpretation principles to a lease agreement). As is the case in contract interpretation, whether a lease is ambiguous or not is a question of law that this Court reviews on a de novo basis. Furtado v. Goncalves, 63 A.3d 533, 537 (R.I. 2013). In determining whether a lease is ambiguous, "we give words their plain, ordinary, and usual meaning. * * * The subjective intent of the parties may not properly be considered by the Court; rather, we consider the intent expressed by the language of the [lease]." Id. (quoting Derderian v. Essex Insurance Co., 44 A.3d 122, 128 (R.I. 2012)). Thus, if a lease "is clear and unambiguous by its terms, 'what is claimed to have been the subjective intent of the parties is of no moment.'" Id. (quoting Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 560 (R.I. 2009)). "In situations in which the language of a [lease] is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." Id. (quoting Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc., 852 A.2d 535, 542 (R.I. 2004)).

After reviewing the record and the lease document itself, we are of the firm opinion that the provisions of the lease at issue are ambiguous. At the outset, we note that section 9.01 of the lease provides that the term "real estate taxes" is to mean its "commonly and generally" accepted sense; however, the lease provides no further assistance as to the meaning of this term or in determining how to allocate Cinemaworld's share thereof. Because the term "real estate taxes" is not defined in the lease, we often refer to sources such as dictionaries to give a term its plain,

ordinary, and usual meaning. See Garden City Treatment Center, Inc., 852 A.2d at 542-43 (in determining the plain meaning of a word, this Court will often apply a common meaning as provided by a recognized dictionary). Nevertheless, a reference to the dictionary provides no assistance in attempting to clarify the meaning of "real estate taxes." Indeed, Black's Law Dictionary defines the term "tax" as "[a] charge, usu[ally] monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue," and the term "property tax" as "[a] tax levied on the owner of property (esp. real property), usu[ally] based on the property's value." Id. 1594, 1596 (9th ed. 2009). These definitions, however, offer no guidance as to how the real estate taxes are to be calculated under the terms of the particular lease at issue here.

In addition, when viewing the lease in its entirety, the sections of the lease relating to the allocation of "real estate taxes" appear to be internally inconsistent. See W.P. Associates v. Forcier, Inc., 637 A.2d 353, 356 (R.I. 1994) ("In determining whether an agreement is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning."). Article 9 of the lease imposes an obligation on Cinemaworld to pay "the actual amount of the [real estate t]axes for such year," although the lease provides no explicit formula or guidance as to how to calculate the "actual amount" of real estate taxes. Section 9.02(b) (emphasis added). Similarly, Article 25 of the lease provides that Cinemaworld is required to pay a "reasonable share" of "any and all taxes," including the real estate taxes assessed against Inland, yet Article 25 fails to define how the "reasonable share" of real estate taxes should be calculated.[4] Section 25.01 (emphasis added). Thus, in addition to not clearly

---

[4] The full text of Article 25, section 25.01 provides:
> "Tenant shall be responsible for, and shall pay, prior to delinquency, any and all taxes, assessments, levies, fees and other

- 8 -

delineating how real estate taxes are to be calculated, Articles 9 and 25 of the lease appear to be in conflict as each give rise to different methods of calculating real estate taxes: Article 9, section 9.02(b) imposes an obligation on Cinemaworld to pay "the actual amount" of real estate taxes, while Article 25, section 25.01 imposes an obligation on Cinemaworld to pay a "reasonable share" thereof. See Rotelli v. Catanzaro, 686 A.2d 91, 95 (R.I. 1996) (contract language is usually ambiguous where the terms are inconsistent on their face).[5] Accordingly, given the different possible ways of calculating real estate taxes, and after reviewing the lease in its

governmental charges of every kind or nature (collectively, 'Charges') levied or assessed by an[y] municipal, county, state, federal or other taxing or assessing authority upon, against or with respect to:

"(i)    The Premises or any leasehold interest therein, or any use thereof, including, without limitation, any use and/or occupancy tax,

"(ii)    All fixtures, furnishings, equipment, merchandise and personal property of any kind owned by Tenant and placed, installed or located in, within, upon or about the Premises, and

"(iii)    All or any portion of the Rentals payable by Tenant to Landlord; irrespective of whether any of such items described in clauses (i) through (i) [sic] above are assessed as real or personal property, and irrespective of whether any of such items are assessed to or against Landlord or Tenant.

"If at any time during the Term any of such Charges are not levied and assessed separately and directly to Tenant (for example, if the same are levied or assessed to Landlord, or upon or against the Shopping Center and/or the land underlying the Shopping Center), Tenant shall pay to Landlord Tenant's reasonable share thereof as reasonably determined by Landlord in consultation with Tenant." (Emphases added.)

While section 25.01 uses the term "real * * * property," that term is synonymous with real estate. See Black's Law Dictionary 1337 (9th ed. 2009) (defining "real property" as "[a]lso termed * * * real estate").

[5] Although the heading of section 25.01, "Taxes on Tenant's Property," seems to indicate that that particular section is limited to personal property and excise taxes assessed and levied against the tenant, we note that headings serve only as an aid in a court's interpretation. See Town of East Greenwich v. O'Neil, 617 A.2d 104, 109 (R.I. 1992) (applying that canon of construction to a statute). Indeed, the text of section 25.01 is broader than the heading and applies to any taxes assessed either to or against "real or personal property" and "to or against Landlord or Tenant."

entirety and according the language its plain, ordinary, and usual meaning, section 9.01—requiring Cinemaworld to pay "all taxes * * * commonly and generally referred to as 'real estate taxes'"—is susceptible to more than one reasonable interpretation and, therefore, is ambiguous. Rotelli, 686 A.2d at 94 (A contract is ambiguous "when it is reasonably and clearly susceptible to more than one interpretation.").

In an effort to blunt the force of the foregoing conclusion, Inland argues that the real estate taxes should be calculated by multiplying the fair market value of Cinemaworld's leased premises by the applicable tax rate. First, Inland maintains that pursuant to G.L. 1956 § 44-5-12(a)—which provides, in pertinent part, that "[a]ll real property subject to taxation shall be assessed at its full and fair cash value * * * to be determined by the assessors in each town or city"—the provisions of the lease that address the allocation of real estate taxes cannot mean anything other than that Cinemaworld must pay the taxes apportioned to its specific, assessed value. We disagree.

Inland's position rests on the assumption that the term "real estate taxes" as used in the lease has the same meaning as applied under § 44-5-12. However, this statutory definition does not automatically render that term to be unambiguous. Although the parties used a phrase that has a statutory definition in Rhode Island, there is nothing in the lease to suggest that the parties intended to adopt this discrete, statutory definition of "real estate taxes." See Garden City Treatment Center, Inc., 852 A.2d at 543 ("Contracting parties are free to define a term as they see fit, but they must do so in writing if they intend the term to carry a technical definition."). Indeed, "[w]e decline to read nonexistent terms or limitations into a contract." Pearson v. Pearson, 11 A.3d 103, 109 (R.I. 2011).

- 10 -

Because the term "real estate taxes" as used in the lease is neither defined within the document, nor specifically governed by the statute, we are satisfied that the term is ambiguous and reasonably susceptible to more than one interpretation. Thus, although contract interpretation is a question of law, when the contract terms are ambiguous, interpretation of the terms becomes a question of fact. Accordingly, at this stage of the proceedings—interpreting ambiguous contractual language—statutes and common-law principles should be considered as only part of the surrounding circumstances from which to discern the intent of the parties. See Citizens for Preservation of Waterman Lake v. Davis, 420 A.2d 53, 58 (R.I. 1980) (While it is well settled that existing law is an implied term of every contract, "existing law is an extrinsic aid to discerning the contracting parties' intent" in construing an ambiguous contract.); see also 11 Samuel Williston, A Treatise on the Law of Contracts § 30:21 at 286 (4th ed. Lord 2012) ("[T]he rule that existing law is incorporated into every contract * * * does not go so far as to mean that statutory definitions in a particular code govern the interpretation of every ambiguous phrase in a private agreement."). A resort to such outside sources is not permitted to aid or explain the intended meaning of the parties, unless and until the contract language is found to be ambiguous. See Furtado, 63 A.3d at 537; Merrimack Mutual Fire Insurance Co. v. Dufault, 958 A.2d 620, 624-25 (R.I. 2008) ("[B]efore the trial justice may look to extrinsic evidence an ambiguity must be found in the terms of the contract."). However, in this case, because we conclude that the language of the lease is ambiguous, we agree with Inland that § 44-5-12 is certainly one of several pieces of extrinsic evidence that should be considered to resolve the ambiguity. Nonetheless, it is not appropriate to consider this evidence on a motion for summary judgment because the intent of the parties is a question of fact. Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980).

Additionally, Inland argues that the allocation of real estate taxes in this case should be determined by references to the valuation of Cinemaworld in "Property Record Card Summar[ies]" that were provided by the municipality. However, in our view, Inland's reliance on the "Property Record Card Summar[ies]" is misplaced. Those summaries were used by the tax assessor in determining the amount of real estate taxes to be levied against the Lincoln Mall. Consequently, they merely provide an explanation as to how the assessment of real estate taxes for the Lincoln Mall was derived. Indeed, Cinamaworld did not exist as a separate taxable parcel during the years in question, and, therefore, contrary to Inland's assertion, the Town of Lincoln did not "independently assess[] the value of Cinemaworld's Premises." Further, the lease itself does not provide that the parties intended the summaries to be a reliable proxy for the fair market value that should be affixed to Cinemaworld.

Accordingly, we are of the opinion that the summaries afford Inland no support for its contention that the lease unambiguously directs that real estate taxes should be allocated by the fair market value of Cinemaworld's premises. However, concluding as we do that the lease is ambiguous in this regard, the summaries may well assist as an interpretive aid to determine the parties' intent, but, again, such a determination cannot properly be resolved at the summary judgment stage. See D.T.P., Inc. v. Red Bridge Properties, Inc., 576 A.2d 1377, 1382 (R.I. 1990) ("If the terms of a contract are ambiguous, the court will look to the construction placed upon such terms by the parties themselves as an aid in determining their intended meaning. * * * The circumstances surrounding the execution of the contract are also relevant to the determination of that intent." quoting Woonsocket Teachers' Guild, Local 951 v. School Committee of Woonsocket, 117 R.I. 373, 376, 367 A.2d 203, 205 (1976)); see Restatement (Second) Contracts

§ 203(b) (1981) (course of performance, course of dealing, and usage in custom or industry may be used in determining the intent of contracting parties).

Finally, Inland maintains that Cinemaworld's interpretation of the lease is unreasonable. Specifically, Inland argues that Cinemaworld would obtain an unfair benefit under a formula that allocates the real estate taxes by square footage, because the Town of Lincoln attributes different values to the various buildings at the Lincoln Mall, and Cinemaworld's leased premises, which is a newer building, has a higher fair market value than most of the other tenants in the Lincoln Mall. Although we agree with Inland that interpreting the ambiguous language of the lease should be guided by well-established principles of contract interpretation, including the principle that contracts are to be construed according to the fair and reasonable meaning of their words, see Durapin, Inc. v. American Products, Inc., 559 A.2d 1051, 1056 (R.I. 1989), summary judgment is inappropriate where references to extrinsic evidence and the surrounding circumstances must be relied on to discern the intent of the contracting parties.

For its part, Cinemaworld maintains that real estate taxes should be calculated based on the square footage of the leased premises, less the taxes attributable to parking and common area. As Inland correctly highlights, Cinemaworld's suggested formula is almost identical to the formula provided under Article 8 of the lease to determine the "Tenant's Proportionate Share" of "Common Area Maintenance Costs." Section 8.04. In particular, the lease provides that "Tenant's Proportionate Share"

> "shall mean a fraction, the numerator of which is the leasable floor area of the Building and the denominator of which is the leasable floor area of all buildings on the Shopping Center as of the first day of the applicable calendar year to which Common Area Maintenance Costs relate." Section 8.04.

However, section 8.03(c) specifically provides that the calculation of "Common Area Maintenance Costs shall not include: * * * Taxes." Adopting Cinemaworld's formula would ostensibly render section 8.03 internally inconsistent with the provisions of the lease that relate to the allocation of real estate taxes and would effectively negate the separate assessment of the Common Area Maintenance Costs from the separate assessment of real estate taxes. See Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004) (An interpretation that reduces certain words of a contract to mere surplusage should be rejected.). While we do not agree with Cinemaworld's contention that the lease is unambiguous with respect to the allocation of real estate taxes, we recognize that it is conceivable that both parties intended the allocation of "real estate taxes" to be based on the leasable square footage—a formula similar to that which Inland had originally championed. See D.T.P., Inc., 576 A.2d at 1382 (the construction placed upon the terms of a contract by the parties serves as an aid in determining their intended meaning); see also In re Dissolution of Anderson, Zangari & Bossian, 888 A.2d 973, 977 n.3 (R.I. 2006) ("[T]he parties' subsequent course of performance may be instructive in contract interpretation." quoting Reed & Reed, Inc. v. Weeks Marine, Inc., 431 F.3d 384, 388 (1st Cir. 2005)). However, we leave it to the trier of fact to determine what significance, if any, this may have on the computation method intended by the parties.

Ultimately, after reviewing the interpretations of the lease presented by both parties, and the somewhat amorphous language of the lease itself, we conclude that there is a genuine issue of material fact. Because we are unable to determine at this stage which of the reasonable but conflicting interpretations of the lease the parties intended, those issues of material fact must be resolved by a trier of fact. See Rotelli, 686 A.2d at 95 ("When a contract is ambiguous, and the pleadings, discovery materials, and affidavits indicate a dispute in respect to the parties' intent,

there exists a genuine issue of material fact that must be resolved by the trier of fact.”).

Accordingly, it is our opinion that the trial justice erred in granting summary judgment in this

case.

**B**

**Interest, Penalties, Expenses, and Attorneys' Fees**

Inland also argues that the lease requires that Cinemaworld pay additional amounts as a

result of its late payment of real estate taxes, pursuant to Article 3, sections 3.02 and 3.03 and

Article 23, section 23.02 of the lease.[6] However, because our review of the record indicates that

---

[6] Article 3, section 3.02 of the lease provides:

> "**INTEREST.** If Tenant shall fail to pay when due any Rental within ten (10) days of the date due and payable, Tenant shall pay to Landlord, as Additional Rent, interest on the unpaid Rental, such interest accruing at the rate of four percent (4%) above the prime rate of interest announced from time to time by Citibank, N.A. (or any successor thereto, or if there shall be no such successor, such other bank or financial institution as Landlord may designate in writing to Tenant) (the 'Default Rule'), from the date due until the date paid."

Section 3.03 of the lease provides:

> "**LATE CHARGE.** If Tenant shall fail to pay when due any Rental within ten (10) days of the date of receipt of notice from Landlord that the same was due and unpaid, then Tenant shall pay to Landlord, as Additional Rent, a late charge equal to four (4%) percent of the unpaid Rental, as an agreed and liquidated amount as compensation for Landlord's additional administrative expenses relating to such late payment. The provisions of * * * [s]ection 3.03 and [s]ection 3.02 * * * are in addition to any other remedies available to Landlord with respect to non-payment of Rental."

Article 23, section 23.02 of the lease provides:

> "**LANDLORD'S EXPENSES OF CURE.** Bills for any expenses incurred by Landlord in connection with any performance by it for the account of Tenant, and bills for all costs, expenses and disbursements of every kind and nature whatsoever, including reasonable attorneys' fees, involved in collecting or endeavoring to collect the Rental or any part thereof not paid when due or enforcing or endeavoring to enforce any rights against Tenant, under or in connection with this Lease, or pursuant to Laws,

there is a genuine issue of material fact as to the parties' intent and that a resolution by a trier of fact is necessary, we need not, and will not, review whether the trial justice erred in declining to award interest, late charges, expenses, and attorneys' fees to Inland.

## Conclusion

For the forgoing reasons, we vacate the trial justice's grant of summary judgment and remand the case for further findings so as to determine the proper formula to calculate real estate taxes.

---

including any such cost, reasonable expense and disbursement involved in re-entering the Premises, instituting and prosecuting summary proceedings, as well as bills for any property, material, labor, or services provided, furnished, or rendered, by Landlord or at its instance to Tenant (all of which expenses shall constitute items of Additional Rent), may be sent by Landlord to Tenant monthly, or immediately, at Landlord's option, and shall be due and payable immediately upon presentation of such bills to Tenant."



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     Inland American Retail Management LLC v. Cinemaworld of Florida, Inc.

**CASE NO:**     No. 2012-151-Appeal.
(PB 08-5051)

**COURT:**     Supreme Court

**DATE OPINION FILED:**  June 18, 2013

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

     Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

     For Plaintiff:  Rachelle R. Green, Esq.

     For Defendant:  Justin T. Shay, Esq.